# In the United States Court of Federal Claims

No. 13-626C
(Filed: July 27, 2017)

| | |
|---|---|
| MICHAEL ROTH & ASSOCIATES, ARCHITECTS & PLANNERS INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | Keywords: Contract Disputes Act; Motion to Dismiss; Claim; Architect-Engineer Services; Design Within Funding Limitations Clause; Changes Clause. |

*Lawrence P. Kaplan*, Kaplan Associates, LLC, St. Louis, MO, for Plaintiff.

*Jessica L. Cole*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were *Franklin E. White, Jr.*, Assistant Director, *Robert E. Kirschman*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, for Defendant.

**OPINION AND ORDER**

**KAPLAN, Judge.**

This case involves a contract dispute between Plaintiff Michael Roth & Associates, Architects & Planners, Inc. (MRA) and the Department of Veterans Affairs (VA). Specifically, MRA seeks an equitable adjustment of the contract price based on what it alleges were changes to the scope of the contract ordered by the VA.

Currently before the Court is the government's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment. For the reasons set forth below, the government's motion to dismiss is **GRANTED** and the case is **DISMISSED** without prejudice.

**BACKGROUND**[1]

**I.     The Contract**

On November 1, 2005, MRA and the VA entered into a contract in which MRA agreed to provide "professional services necessary for the design of various projects against task order delivery contracts when ordered" by certain VA medical centers. Compl. Ex. A at 1, ECF No. 1-2. The architectural, interior design, and structural services to be provided included the "preparation of studies, schematics, investigative services, design development, construction documents, cost estimates, construction period services, visits to the site, miscellaneous reports and other related activities." Id.

The contract was an indefinite-quantity contract in which all "supplies and services to be furnished" were to be "ordered by issuance of delivery orders or task orders." Id. at 19. Specifically, the parties described the agreement as a "master contract obligating the Architect-Engineer to provide services by task-order on various projects." Id. at 12. The initial contract term was one year, with four one-year options, and an annual contract ceiling of $450,000. Id.

Under the contract, the VA would issue task orders upon agreement "by the Architect-Engineer and the [CO]" as to their terms. See id. The VA would first issue a "statement of work" with a "request for a proposal to perform the required services." Id. MRA was then required to "promptly submit a proposal . . . includ[ing] a detailed cost or pricing breakdown on a VA form 08-6298, Architect-Engineer Fee Proposal." Id. Once MRA and the VA agreed on the "services to be performed, fee, and time for completion," the CO would "issue a Task Order against the contract, reflecting all terms agreed upon." Id. If MRA and the VA could not reach agreement over a particular statement of work, "neither party [would] be under any obligation to the other, with respect to the services covered by the particular statement of work." Id. at 13.

Section 2.20 of the contract, entitled "52.243-1 Changes—Fixed-Price (Aug 1987) Alternate III (Apr 1984)," incorporated the language from the Federal Acquisition Regulation's (FAR) changes clause. Part I, App. to Def.'s Mot. to Dismiss for Lack of Subject-Matter Jurisdiction or, in the Alternative, for Summ. J. (Def.'s Mot. App. Pt. I) at DA29, ECF No. 28-2. It states, in pertinent part:

> (a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in the services to be performed.
>
> (b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting

---

[1] The facts in this section are based on the allegations in MRA's complaint, as well as on jurisdictional facts from the deposition transcripts and documentary evidence supplied by the parties.

> Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.
>
> . . . .
>
> (f) No services for which an additional cost or fee will be charged by the Contractor shall be furnished without the prior written authorization of the Contracting Officer.

Id.

In addition, Section 2.14 of the contract set forth the language of the clause contained at FAR 52.236-22, entitled "Design Within Funding Limitations (Apr 1984)." Id. at DA27. That provision stated as follows:

> (a) The Contractor shall accomplish the design services required under this contract so as to permit the award of a contract, using standard Federal Acquisition Regulation procedures for the construction of the facilities designed at a price that does not exceed the estimated construction contract price as set forth in paragraph (c) below. When bids or proposals for the construction contract are received that exceed the estimated price, the Contractor shall perform such redesign and other services as are necessary to permit contract award within the funding limitation. These additional services shall be performed at no increase in the price of this contract. However, the Contractor shall not be required to perform such additional services at no cost to the Government if the unfavorable bids or proposals are the result of conditions beyond its reasonable control.
>
> (b) The Contractor will promptly advise the Contracting Officer if it finds that the project being designed will exceed or is likely to exceed the funding limitations and it is unable to design a usable facility within these limitations. Upon receipt of such information, the Contracting Officer will review the Contractor's revised estimate of construction cost. The Government may, if it determines that the estimated construction contract price set forth in this contract is so low that award of a construction contract not in excess of such estimate is improbable, authorize a change in scope or materials as required to reduce the estimated construction cost to an amount within the estimated construction contract price set forth in paragraph (c) below, or the Government may adjust such estimated construction contract price. When bids or proposals are not solicited or are unreasonably delayed, the Government shall prepare an estimate of constructing the design submitted and such estimate shall be used in lieu of bids or proposals to determine compliance with the funding limitation.

> (c) The estimated construction contract price for the project described in this contract is [insert price].

Id. The contract also provided that if the low bid for constructing the design exceeded this clause's estimated construction contract price, the VA could "relieve[] [MRA] of th[e] requirement [of FAR 52.236-22 to design within the construction limitation] by the award of a construction contract, notwithstanding the relation of the award price to the authorized construction cost." Id. at DA32.

## II. The Task Order

In 2008, the VA issued a task order for architectural-engineering services. See id. at DA59. The task order's scope of work encompassed "A/E services . . . to prepare Schematics, Design Documents (DD), Construction Documents [(]CD), Cost Estimates and Construction Period Services (CPS) for Project 657-330, Expand Open Heart Surgery/Relocate Cardiology, B-1, JC at the John Cochran Division of the VA Medical Center, St. Louis, Missouri." Id. at DA60. It also provided that the VA would pay MRA a flat fee of $311,924.97 for these services. Id. at DA59. The task order stated that "[i]n accordance with 52.236-22, Design Within Funding Limitation (Apr 1984), the estimated construction contract price for this project is $3,688,000, not including any contingency." Id. at DA61 (emphasis in original).

## III. Modification of the Task Order

By October 2010, MRA believed it was "95 percent complete with the construction documents." Part II, App. to Def.'s Mot. to Dismiss for Lack of Subject-Matter Jurisdiction or, in the Alternative, for Summ. J. (Def.'s Mot. App. Pt. II) at DA235, ECF No. 28-3 (July 10, 2014 deposition of Michael Roth); see also Def.'s Mot. App. Pt. I at DA74. At that time, MRA estimated that the cost of constructing the facility it designed would be $3,782,082, which exceeded the budget established under the task order by $94,082. Def.'s Mot. App. Pt. I at DA70.

On or about February 22, 2011, the contracting officer (CO) issued a statement of work requesting revisions to certain aspects of the project. See id. at DA74–76. The purpose of the revisions was "to incorporate scope changes from the original professional services contract after the 95% Submittal dated October 7, 2010 beginning with the November 23, 2010 meeting." Id. at DA74; see also id. at DA74–76 (describing revisions required under statement of work, including, among other things, changes needed to reflect the requirements for new imaging equipment for use in the new cardiology unit's electrophysiology and cardiac catheterization labs). Additionally, the CO wrote that the "Change Order" was intended "to compensate the Architect/Engineer for the scope changes to bring the project back up to the 95% completion level for those elements of the project affected by the scope changes, including cost estimating services." Id. at DA74. The modification would also "compensate[] the A/E for the services required on the scope changes from the 95% completion level through construction completion." Id.

The statement of work specified a reduced "Project Construction Cost" of $3,122,000. Id. It also noted that MRA's "additional service fees" for the Change Order would "reduce the funds

available for project construction." Id. It reiterated that "[t]he A/E [was] responsible for designing the project within the Project Cost Amount." Id. Under the terms of the proposed Change Order, MRA would also be required to include "[d]eductive alternates . . . in the Contract Documents to reduce the probable Construction Cost to at least 10% below the current Project Construction Cost Amount." Id.

On March 22, 2011, MRA proposed that it be paid a flat fee of $176,101.33 to complete the work required by the task order as modified. Id. at DA77. The VA accepted MRA's fee proposal and, "pursuant to the authority of: FAR A/E Changes Clause," it issued Modification Number 2 to the task order, with an effective date of May 9, 2011. See Def.'s Mot. App. Pt. II at DA113. Under the modification, MRA would "[p]rovide design revisions per [the] Statement of Work dated 2/22/11 and in accordance with [its] revised proposal dated March 22, 2011" for a total additional fee of $176,101.33. Id. Modification Number 2 also stated that "[t]he Project Construction Cost Amount [was] to be reduced from $3,122,000.00 to $2,945,900.00." Id. Additionally, it included the requirement that "[d]eductive alternates . . . be included in the Contract Documents to reduce the probable Construction Cost to at least 10% below the Project Construction Cost Amount of $2,945,900.00." Id. Finally, the modification also included a release, stating that "[t]he consideration represents a complete equitable adjustment for all costs, direct and indirect, associated with the work and time agreed to herein, including, but not limited to, all costs incurred for extended overhead, supervision, disruption or suspension of work, labor inefficiencies, and this change's impact on unchanged work." Id. Both Michael Roth and the CO, Pauline Czajkowski, signed the modification. Id.

### IV. MRA's Cost Estimates For Construction Under the Task Order as Modified

After the task order was modified, MRA continued to complete its design work, including the required revisions. See id. at DA114. In August 2011, it informed the CO's technical representative (COTR) via voicemail that its construction cost estimates for the project as modified were above the Project Construction Cost Amount. See id.

The COTR responded to the voicemail with an email in which he opined that MRA's project cost estimates were "overly conservative" and inconsistent with MRA's prior estimates. Id. In fact, the COTR observed, MRA had increased its project cost estimate by more than 40% over its previous estimate. Id. The COTR advised MRA to "update and refine" its estimates by the conclusion of the design development stage. Id. "If the project is still over budget at that time," he observed, "we can discuss what elements need to be addressed to bring the project scope within budget." Id.

### V. MRA Seeks a Second Modification of the Task Order

On March 16, 2012, MRA emailed the CO and COTR to request a new modification to the task order. See id. at DA123. It noted that the previous modification, which it described as issuing in March 2011, covered "costs related to the change in work scope associated with previously requested changes," which were "made and completed by August, 2011." Id. MRA stated that its "newly requested modification request" was "to cover additional services requested over the past 7 months," including 1) "services related to the infrastructure project including design"; 2) "documentation bidding services and site visits"; 3) "time spent trying to make use of

5

the laser scan data submitted"; 4) "time spent making changes to previously approved designs including the 3D model of the EP lab"; 5) "changes to HVAC, lighting, data, power, etc. related to changing the documents and a later decision to use a plenum box"; 6) "multiple changes to casework and storage system layouts"; 7) "additional work due to the untimeliness of being able to access the new cardiology area to measure it"; and 8) "the need to again refinalize and recoordinate the final documents." Id. MRA sought a fee increase of $37,737. Id.

On March 18, 2012, the CO responded by email. Id. at DA158. She indicated that she had "not receiv[ed] anything at all from [MRA] . . . to show what work [it] had put into the design," and thus she did "not understand how [she] could . . . possibly have considered [MRA's] request for another mod[ification] for additional costs." Id. Further, she requested additional drawings representing the status of MRA's design work at different points in time and stated that she would "not be considering any additional service requests . . . until those files [were] provided." Id. at DA159.

### VI. MRA's Final Construction Cost Estimate

In April 2012, MRA submitted bid documents for the project to the VA. Id. at DA163. In the documents, it estimated a project construction cost of $4,591,842.54, which was $1,645,943 over the $2,945,900 construction cost ceiling set forth in the task order as modified. See id. at DA165, DA169. MRA also provided seven deductive alternates which in total reduced the estimated construction cost to $3,348,864.25. See id. at DA165. This amount was still $402,964.25 greater than the Project Construction Cost. See id.

### VII. MRA Requests Compensation for Alleged Additional Changes in Contract Scope

Some four months later, on August 16, 2012, MRA wrote to the CO again requesting a fee increase. Id. at DA170. It claimed that since its March 16, 2012 letter, "the scope [of the project] ha[d] increased and [its] estimate [wa]s now $4,592,000 prior to bidding." Id. MRA explained that, in its view, its original fee was based on the original construction budget, and that its hourly fees as agreed to in the contract were no longer applicable because they were only good for four years (which had passed). Id. MRA wrote that because "the VA continu[ed] its scope changes to realize a project over budget, MRA requests an increase in A/E fee commensurate with the current estimate and future construction bid." Id.

The CO responded on August 31, 2012. Id. at DA172–73. The CO quoted the text of Modification 2 and observed that "[t]he square footage and scope of the project ha[d] not changed since Modification 0002." Id. at DA172. She reminded MRA that it had "agreed when [it] signed the modification that the construction cost amount was to be reduced to $2,945,900" and that it was paid an additional $176,101 for services provided in order to accomplish the tasks required under the modified task order. Id. "Therefore," the CO concluded, she "[would] not be considering any prior issues to the modification of May 9, 2011." Id. With respect to any claims for "an increase in salary costs and for any services provided after Modification 0002," the CO told MRA, it would "need to provide the breakdowns and documentation." Id. at DA173.

In the meantime, on December 12, 2012, the VA entered into a contract with JW Fuller Construction for the renovation work at the St. Louis VA Medical Center. Id. at DA174–75. The

6

contract award amount was $3,050,300. Id. at DA175. This amount included four of the deductive alternates. Id. at DA176. JW Fuller also offered to complete an additional six optional bid items for an aggregate total of approximately $1,360,000. Id. at DA177–79.[2]

Six weeks later, on January 29, 2013, MRA submitted another request for increased compensation. Id. at DA183–84. It again alleged that it was owed compensation by the VA "for an increase in work scope above and beyond Modification 2, which adjusted our compensation upward by $176,101." Id. at DA183. It further stated that "[t]he VA increased and adjusted work scope beyond that of Modification 2, and at the same time decreased the project budget from $3,122,000 to $2,945,900." Id. According to MRA, the COTR had "increased and revised the work scope [by] adding refinements and details resulting in a significant cost increase in the construction cost." Id. It also complained that even though it had warned the VA about its estimates being over-budget, the VA's only response had been to dispute the validity of MRA's estimates. Id.

Additionally, MRA asserted that because the construction contract had been awarded for more than the $2.945 million Project Construction Cost, there must have been "an increase in unacknowledged work scope." Id. It thus informed the VA that it expected to make an "additional compensation request . . . between $120-125,000." Id. at DA184.

CO Czajkowski responded by email on January 30, 2013. Id. at DA185. She reminded MRA that in her August 31, 2012 letter she had indicated that she would consider an increase in salary costs for services provided after Modification 2, but that in order to provide such an increase she would need for MRA to supply a breakdown of costs, along with documentation. Id. She pointed out that MRA had still not provided any documentation to support its request. Id.

On February 6, 2013, MRA submitted timesheets for November 2010 through August 2012 to "substantiate [MRA's conclusions regarding] the total monetary value of the actual time MRA spent versus the amount provided in the approved Modification 2." Id. at DA186. It requested an additional fee of $107,777, representing the difference between the fee approved to provide the services outlined in the modification and what MRA contended was the actual value of the services provided by Mr. Roth and the two members of his design team who worked on the task order as modified. Id. at DA187.[3]

The CO responded on April 4, 2013. Id. at DA191. She began by noting that MRA's "demand was not certified as set out in 48 CFR § 52.233-1," and thus she did not "consider [it] a 'claim' for purposes of the Contract Disputes Act." Id. Further, she told MRA that based on the documentation and her consultation with the VA's legal department, the VA "ha[d] no legal

---

[2] VA procurement staff subsequently requested that additional funds be allocated to the project by the VA's Office of Capital Asset Management and Support, Def.'s Mot. App. Pt. II at DA180–82, but that request was denied in February 2013, id. at DA188.

[3] MRA claimed that it was actually entitled to $125,405 for the additional work. Def.'s Mot. App. Pt. II at DA186–87. Mr. Roth, however, agreed to reduce his hours by 50%, which he said "more accurately reflect[ed his] effort." Id.

7

basis to make the payment [it] . . . demanded." See id. She referred MRA to the concerns raised in her August 31, 2012 letter, and also referenced the release language contained in the change order. Id. In addition, she stated that MRA's "request for 'the total monetary value of the actual time MRA spent versus the amount provided in the approved Modification 2' has already been addressed by Modification 2," which had "provided for a cash payment in exchange for all costs associated with the work specified in the modification." Id. (quoting id. at DA186).

The CO also noted that the contract required that changes in scope be approved in writing by the CO. Id. at DA192. Therefore, she advised that if MRA were alleging a change in scope that she had authorized in writing, and could show how it specifically increased MRA's costs, she would consider such a demand. Id. But, she explained, "[t]wo years of timesheets itemizing hours worked as 'VA-JC Cardiology' provide no basis for me to consider additional payment." Id. "At best," the CO concluded, "they show your firm was doing the work both parties contemplated when Modification 2 was signed." Id.

MRA responded by letter on April 25, 2013. Id. at DA193–94. MRA set out the "components [which] constitute[d] the sources of extra work performed in [its] substantial time overage for modifications which were requested via emails but not formally approved by the VA." Id. at DA193. First, MRA stated that the VA had required it to design "a larger project." Id. Thus, according to MRA, "the primary reason we incurred additional hours on the Cardiology project is that we were directed to design a project 1.5 times larger than the available budget." Id. It further asserted that when it informed the COTR of its over-budget estimates, the COTR told MRA that it was "wrong and instructed [it] to continue with producing construction documents." Id. According to MRA, it was required to work an additional 1,253.25 hours in order to satisfy the VA's demands. Id.

In addition to its general allegation that the VA directed MRA to design a project that was larger than the available budget, MRA also claimed that it spent additional hours on certain specified tasks. Id. at DA193–94. These included working on a "3D Point Cloud" (sixteen extra hours), designing demountable ceilings (twenty extra hours), designing a relocation of the piping (twenty-four extra hours), providing plans and specifications for furniture and equipment (sixty extra hours), changing mechanical designs based on updated VA design guidelines (eight extra hours), adding rooms and widening a lobby (twenty-four extra hours), and revising casework for laboratories (thirty-two extra hours). Id.

Shortly afterwards, MRA sent another letter to the CO, dated May 13, 2013, with the subject line "Claim Under the Contract Disputes Act of 1978 as Amended." Id. at DA195. The letter stated that it included "materials supporting the claim of Michael Roth & Associates, Architects & Planners, Inc. (MRA) for work performed on the . . . project including [its] letter . . . of April 25, 2013." Id. MRA claimed an entitlement to increased compensation in the amount of $107,777 "per [its] letter on February 6, 2013." Id. MRA also included the Contract Disputes Act's certification language. Id.

On July 22, 2013, the CO responded. Id. at DA196–201. She observed that MRA's claim for additional hours worked based on the construction cost of the project (which represented 87.2% of the total additional hours claimed) was not compensable under the changes clause because "[t]he scope of The Project did not change since the acceptance of Modification #002 to

the contract." Id. at DA196–97. The CO explained that "[w]hile the construction cost is a material issue in the computation of whether or not MRA's fee is within the mandated 6% A/E Fee Limitation of 836.606-73, the construction cost is not a material issue since MRA's fees were negotiated on the basis of man-hours and project scope, not construction cost." Id. at DA197.

The CO then addressed and rejected each of the specific alleged tasks for which MRA claimed that it was entitled to additional compensation in its April 25, 2013 letter. See id. at DA197–201. The CO also found that, in any event, the timesheets MRA had submitted for additional man-hours were defective because, among other things, they were prepared solely for purposes of making a claim and not in the normal course of business, contained major discrepancies, and appeared to be inflated. Id. at DA200–01.

In short, the CO found that MRA's claim for an equitable adjustment in the amount of $107,777 for changes in the scope of work lacked merit. See id. at DA201. Accordingly, she advised MRA that her letter was "the final decision of the Contracting Officer" and informed it of its appeal rights under the disputes clause. Id.

**VIII.   This Action**

On August 30, 2013, MRA filed a complaint in this court. ECF No. 1. In its complaint, MRA alleges that the VA directed "changes . . . to the scope of the contract and the services performed," which "caused an increase in both the time and costs required for performance." Compl. ¶ 21. It further alleges that the VA violated the changes clause in the contract by not making an equitable adjustment in the contract price. Id. ¶¶ 21–22; see also id. ¶¶ 5–7, 10. MRA seeks $125,405 in damages. Id. at 4.

After discovery was completed, the government filed a motion to dismiss and motion for summary judgment on February 6, 2015. ECF No. 28. MRA responded on March 9, 2015. ECF Nos. 29–32. Oral argument was held before Judge Wolski (to whom this case was previously assigned) on June 11, 2015. See Order, ECF No. 39. Judge Wolski then requested supplemental briefing, which was completed on February 3, 2016. ECF Nos. 40–44, 49–50, 52–53. On March 30, 2017, the case was reassigned to the undersigned. ECF No. 57.

**DISCUSSION**

The government has moved to dismiss MRA's complaint. It contends that the Court lacks jurisdiction over MRA's claim for an equitable adjustment because MRA failed to first present its claim to the CO as required by the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–09. Alternatively, the government contends that MRA's claim lacks merit and that it is entitled to judgment as a matter of law.

For the reasons set forth below, the Court agrees that the claim MRA is pursuing in this Court was not presented to the CO. Accordingly, the Court lacks jurisdiction to consider it and MRA's complaint must be dismissed.

9

### I.  Standards for Motions to Dismiss on Jurisdictional Grounds

Generally, in deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). However, if a movant disputes the basis of the Court's jurisdiction, the allegations in the complaint are not controlling and the Court may review evidence extrinsic to the pleadings. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993). The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013); see also Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). If the court does not have subject matter jurisdiction, it must dismiss the claim. Rules of the Court of Federal Claims (RCFC) 12(h)(3).

### II.  Jurisdiction Under the Contract Disputes Act

The Tucker Act grants the United States Court of Federal Claims the power "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Further, the Court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under [the CDA], including a dispute concerning termination of a contract." Id. § 1491(a)(2).

The CDA applies to any express or implied contract made by an executive agency for, among other things, the procurement of services. 41 U.S.C. § 7102(a)(2). Under the CDA, when a contractor has a claim against the government, the "claim . . . shall be submitted to the [CO] for a decision." Id. § 7103(a)(1). This must be done in writing. Id. § 7103(a)(2). Further, all claims for more than $100,000 must be certified. Id. § 7103(b)(1).

Under the CDA, a "claim" is a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain." See England v. The Swanson Grp., Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004) (quotation omitted); see also Paradigm Learning, Inc. v. United States, 93 Fed. Cl. 465, 472 (2010) (citing FAR 52.233-1(c)); FAR 2.101 (defining "claim). The written demand or assertion must be non-routine. See James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1542 (Fed. Cir. 1996). Further, a claim under the CDA must contain a "clear and unequivocal statement that gives the [CO] adequate notice of the basis and amount of the claim." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). A claim may be established based upon the submission and consideration of multiple documents, as long as the combination "make[s] clear how much the plaintiff is willing to accept in settlement of its claim" and the additional documents are sufficiently cross-referenced to permit the CO to understand that together they constitute the claim. N. Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 185–86 (2007); see also Kvaas Constr. Co. v. United States, 22 Cl. Ct. 740, 742 (1991).

Once a claim is submitted, the CO must issue a decision in writing. 41 U.S.C. § 7103(d). The CO's written decision "shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights," but "[s]pecific findings of fact are not required." Id.

§ 7103(e). A contractor that has received a CO's written decision on its claim may bring an action directly in the Court of Federal Claims "in lieu of appealing the decision of a [CO] . . . to an agency board." Id. § 7104(b)(1). The contractor must do so within twelve months from "the date of receipt of a [CO]'s decision." Id. § 7104(b)(3).

Compliance with the dispute resolution procedures set forth in the CDA is a prerequisite to the Court's exercise of jurisdiction over claims covered by that act. See England, 353 F.3d at 1379 (observing that "jurisdiction over an appeal of a [CO]'s decision is lacking" unless the claim is first presented to the CO for decision). Thus, for the Court to have subject matter jurisdiction over a CDA dispute, as in the present case, there must be "both a valid claim and a [CO]'s final decision on that claim." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing James M. Ellett Constr. Co., 93 F.3d at 1541–42).

### III. The Merits of the Government's Motion to Dismiss

The first task before the Court in determining whether the CDA's exhaustion requirement has been satisfied is to identify precisely the nature of the claim MRA is pursuing before this Court. Once the Court has identified the claim before it, it must then decide whether that claim was presented to the CO prior to MRA bringing it in this Court.

In this case, discerning the basis for MRA's claim of entitlement to an equitable adjustment is a challenge. Its complaint cites the changes clause and alleges that the VA directed changes in the scope of the contract. The complaint does not, however, identify what those changes to the scope of the contract were or what additional services it performed as a result of the changes. Thus, it is not at all clear based on MRA's complaint whether it is seeking an adjustment based on its performance of any of the alleged additional tasks specified in its April 25, 2013 letter or its other correspondence with the VA.

Nor does MRA's brief in opposition to the government's motion to dismiss reference any specific work that it was required to perform that was outside the scope of the task order as modified. In that brief, however, MRA does clarify, at least to some extent, the legal theory underlying its claim before this Court. That theory is apparently based in large part on its rather novel interpretation of the design within funding limitations clause.

Thus, MRA observes that its "claims concern the government's breach of the IDIQ terms . . . after MRA provided the information that it was impossible to build the Project according to the requested designs for $2.945 million." Pl.'s Resp. to Def.'s Mot to Dismiss for Lack of Subject Matter Jurisdiction & Mot. for Summ. J. (Pl.'s Resp.) at 8, ECF No. 31. It contends that "[t]he [CO] did not adequately address MRA's warnings according to its revised estimate of construction cost, failed to authorize a change in scope, and failed to adjust the estimated construction contract price." Id. "Instead," MRA argues, "the VA insisted on designs that equated to a $4 million construction budget—fundamentally changing the terms of the task order." Id. Thus, "[r]ather than reducing the scope of the task order by eliminating the design of the two cath labs, the VA required acts beyond the scope of the IDIQ, including redefining the cath lab designs as 'alternate deducts' and 'bid option.'" Id. "Although the contract fundamentally changed," MRA asserts, and despite its "repeated requests," "the VA failed to equitably adjust the contract payment to MRA." Id.

11

As noted, MRA's rather opaque legal theory is based on the notion that the VA failed to comply with obligations imposed upon it by section 2.14 of the contract, the design within funding limitations clause. That clause, as described above, required MRA to design the project within the limitations of the project construction cost set forth in the task order as modified. It further provided that re-designs to meet the construction cost limitation would be provided by MRA at no cost to the government, unless unfavorable bids or proposals received were "the result of conditions beyond its reasonable control." Def.'s Mot. App. Pt. I at DA27. The clause further stated that:

> The Contractor will promptly advise the Contracting Officer if it finds that the project being designed will exceed or is likely to exceed the funding limitations and it is unable to design a usable facility within these limitations. Upon receipt of such information, the Contracting Officer will review the Contractor's revised estimate of construction cost. The Government may, if it determines that the estimated construction contract price set forth in this contract is so low that award of a construction contract not in excess of such estimate is improbable, authorize a change in scope or materials as required to reduce the estimated construction cost to an amount within the estimated construction contract price set forth in paragraph (c) below, or the Government may adjust such estimated construction contract price.

Id.

According to MRA, the VA violated this clause when—instead of either changing the scope of the project or the materials required to bring costs down, or adjusting the estimated construction contract price upward—it "insisted that MRA continue designing the project that it understood to be in excess of $4 million." Pl.'s Resp. at 31. "As such," MRA contends, the VA "required MRA to provide Project Construction Drawings for a project of a far greater scope than what was stated in the last modified task order." Id. It further argues that "[i]f the VA had decreased the scope of the project, eliminating the design of the cath labs, MRA would not have been required to expend the hours needed to further said work." Id. "Alternatively," MRA posits, "had the VA increased the stated Project Construction Cost, then MRA would have been entitled to . . . an increase of its design fee to be within 6% of the Project Construction Cost, according to the terms established in the IDIQ." Id. at 31–32.

As best the Court can understand MRA's legal theory, it appears to be arguing that once MRA advised the VA of its belief that the project could not be built within the funding limitations of the task order as amended, the VA was required to either authorize a change in the scope or the materials for the project so that it would be cheaper to construct, or to adjust the construction price upward. The VA, however, did not exercise either of these options. Instead, it directed MRA to continue its work and complete the design services required by the task order as modified. Although not entirely clear, it appears to be MRA's contention that once MRA (and the VA) understood that construction of the design would be over budget, the services MRA was providing became attributable to a project other than the one set forth in the task order as modified. See id. at 41 (arguing that because "the Government chose . . . to demand that the

work continue despite the fact the design would be in excess of the stated Project Construction Cost" MRA "adequately demonstrated that the contract was constructively changed by implication . . . and that MRA was forced to design beyond the stated constraints of the IDIQ and Task Order"); see also Pl.'s Second Suppl. Br. at 2, ECF No. 44 (arguing that "[b]y refusing to reduce the scope of the work in the face of receiving the MRA estimates . . . the Government ordered work outside the scope of the contract"). Thus, according to MRA, there was a "constructive change" in the scope of the contract. What follows from that, according to MRA, is that it is entitled either to an equitable adjustment for all work it performed after it advised the VA of its position, or to an increase in its design fee to reflect the upward adjustment in the construction contract price that the VA was allegedly required to make. The latter contention is based on MRA's assertion that if the contract price went up, then its fee would necessarily have to go up as well by virtue of FAR 15.404-4(c)(4)(i)(B). See Pl.'s Resp. at 7, 12, 31–32.

The Court agrees with the government that MRA did not present a claim to the CO based upon this theory of recovery. While the theories of recovery set forth in MRA's letters to the CO are themselves almost equally opaque, frequently referring to "changes in scope" without specifying what those changes were or breaking down their costs, one thing is clear: nowhere in MRA's February, April, or May 2013 letters did it ever mention, cite, or even allude to the design within funding limitations clause. Nor did those letters identify any connection between any violation of that clause by the VA and the allegedly additional hours of work for which MRA then claimed compensation.

While "merely adding factual details or legal argumentation does not create a different claim, . . . presenting a materially different factual or legal theory" does so. K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1006 (Fed. Cir. 2015). As the court of appeals has noted, requests for relief are treated as involving separate claims "if they either request different remedies (whether monetary or non-monetary) or assert grounds that are materially different from each other factually or legally." Id. at 1005 (citing Contract Cleaning Maint., Inc., 811 F.2d at 592) (emphasis in original). "This approach, which has been applied in a practical way, serves the objective of giving the contracting officer an ample pre-suit opportunity to rule on a request, knowing at least the relief sought and what substantive issues are raised by the request." Id. at 1006.

In this case, the CO did not have any opportunity to rule on MRA's claim based on the design within funding limitations clause, because MRA did not assert that clause as a basis for its requests for equitable adjustment (either explicitly or implicitly). Further, MRA's claim based on the design within funding limitations clause involves the consideration of different operative facts than the claims it made to the CO. The claim before this Court focuses on whether the VA ever "determine[d] that the estimated construction contract price set forth in th[e] contract [wa]s so low that award of a construction contract not in excess of such estimate [wa]s improbable"; whether the VA was required to have chosen one of the options listed in the clause if it made such a determination; if so, which choice it would have made; and how that choice or lack thereof would have affected MRA's entitlement to additional fees. See Def.'s Mot. App. Pt. I at DA27. The claims before the CO appear to have involved whether MRA was directly ordered to perform particular tasks and whether those tasks were within the scope of the task order as modified. See Def.'s Mot. App. Pt. II at DA193–94.

13

In any event, even if MRA's letters could be read to have presented to the CO the claim that it presses here, the government would be entitled to summary judgment because MRA's argument fails on the merits as a matter of law.[4] The design within funding limitations clause imposes only one duty on the VA: that it "review the Contractor's revised estimate of construction cost" after the contractor notifies it that the project being designed will likely exceed the funding limitation. See Def.'s Mot. App. Pt. I at DA27. Then, upon review, "if" the VA "determines that the estimated construction contract price set forth in th[e] contract is so low that award of a construction contract not in excess of such estimate is improbable," it "may . . . authorize a change in scope or materials as required to reduce the estimated construction cost to an amount within the estimated construction contract price . . . or the Government may adjust such estimated construction contract price." Id. (emphasis added).

In this case, even assuming that the CO had agreed with MRA that the construction cost estimate was too low, the VA was not obligated to choose one of the options set forth in the clause; the options were discretionary. See McBryde v. United States, 299 F.3d 1357, 1362 (Fed. Cir. 2002) (noting that generally the use of the word "may" "conveys some degree of discretion"). And even if the VA took one of the options set forth in the clause (as MRA incorrectly claims it was required to do), it is unclear to the Court how doing so would have entitled MRA to an equitable adjustment unless MRA was, as a result, tasked with providing additional services (and unless the direction to do so was made in writing as required by the changes clause). MRA's argument seems to be grounded in the notion that the scope of the task order was changed (at least constructively) once it became apparent (at least to MRA) that the cost of the project would be higher than the project's construction estimate as set forth in the task order as modified. At that point, MRA posits, it was in effect performing design services for a different, "larger" project than the one set forth in the task order. But this argument lacks logic and is unsupported by any legal authority. There was no change in the nature of the services that MRA was required to perform as a result of its higher construction cost estimate. Nor was the project itself changed or made "larger." All services MRA performed after it advised the VA of its view that the construction cost estimate was too low continued to be based on the requirements of the task order as modified.

Finally, even assuming the claim was before the Court, neither the changes clause nor the design within funding limitations clause provides a right to recovery when coupled with MRA's arguments regarding FAR 15.404-4(c)(4)(i)(B). That provision states that a CO "shall not negotiate a price or fee that exceeds . . . [f]or architect-engineer services . . . 6 percent of the estimated cost of construction." In other words, the architect's fee (set by the task order prior to design) may not be more than 6% of the estimated construction cost. This clause does not, however, entitle MRA to receive a fee that is 6% of the final construction cost estimate or the actual construction cost (unless such a fee is agreed to by the parties). Thus, even if the VA had

---

[4] The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

adjusted the estimated construction cost upward, that adjustment would have had no effect on the fee MRA was entitled to receive.

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss is **GRANTED** and Plaintiff's complaint is **DISMISSED** without prejudice. The Clerk is directed to enter judgment accordingly. Each party shall bear its own costs.[5]

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan<br>
ELAINE D. KAPLAN<br>
Judge

---

[5] In its opposition brief, MRA cites the doctrine of superior knowledge and argues that the VA breached the covenant of good faith and fair dealing and engaged in misrepresentation in its dealings with MRA. E.g., Pl.'s Resp. at 38–39. The Court declines to consider these claims (which were not, in any event, made to the CO) because they are not pleaded in the complaint. See Michels v. United States, 72 Fed. Cl. 426, 431–32 (2006) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984) (alteration in original))); see also Crest A Apartments Ltd. II v. United States, 52 Fed. Cl. 607, 613 (2002).